Chief Judge John J. McConnell, Jr.
United States District Court
For the District of Rhode Island
One Exchange Street
Providence, RI 02903

April 06, 2020

RE: UNITED STATES V. MICHAEL P. TATRO, CASE NUMBERS 1:07-cr-00143 AND 1:14-cr-0087

    DEFENDANT'S EMERGENCY LETTER-MOTION TO REDUCE SENTENCE AND FOR IMMEDIATE RELEASE ON THE
    GROUNDS OF EXTRAORDINARY AND COMPELLING CIRCUMSTANCES UNDER 18 U.S.C. 3582(C)(1)(A), AND
    TO APPOINT COUNSEL TO ASSIST HIM IN THIS MATTER, IF DEEMED NECESSARY BY THE COURT.

Dear Judge McConnell:

I respectfully submit this request to reduce my sentence and for IMMEDIATE RELEASE under 18 U.S.C. 3582 (C)(1)(A)(i), on the grounds of extraordinary and compelling circumstances. I am an insulin dependent, Type II Diabetic, with uncontrolled thyroid disease, and uncontrolled high blood pressure (hypertension), each of which medical condition has been specifically identified by the Centers for Disease Control (CDC) as increasing the risks (1) for contracting COVID-19, and (2) experiencing severe complications if COVID-19 is contracted. More significantly, and as more fully stated below, the current confinement and living conditions here at FCI Danbury make it utterly impossible for me to adhere to (and thus benefit from) the social distancing, appropriate self care, and other preventative measures developed by the CDC. Similarly, the medical capacity here is stretched to the limits in the best of non-Covid 19 times and their operational ability to respond to this crisis is severely handicapped, making my access to medical treatment tenuous, at best.

I further request that the Court appoint counsel to assist me in this matter with respect to expeditiously gathering any required medical records or other documents which the Court may deem necessary in ruling upon this request.

In support hereof, I will address (A) the facts relevant to my conviction and sentence as well as how I have utilized my time during incarceration, (B) my current and past medical history, (C) the prevalence of COVID-19 within the Bureau of Prisons generally, and at FCI Danbury more particularly, and (D) the Court's authority to grant this request notwithstanding my inability to, and thus the futility of the administrative remedy process and the manner in which other District Court's have ruled on COVID-19 related motions in the past seven days, and (E) my plan if immediately released from custody.

A. FACTS RELEVANT TO CONVICTION AND SENTENCE AND POST CONVICTION REHABILITATION.

1. Conviction and Sentence

I have been incarcerated since February 01, 2014. On September 19, 2015, following a plea agreement, I was sentenced by Chief Judge Smith to a term of imprisonment of 46 months on case number 14-cr-0087, with a consecutive term of 24 months for a violation of supervised release on case number 07-cr-00143, for a total sentence of 70 months.

However, my federal sentence did not begin to run until I was paroled from my Rhode Island Sentence on 01/12/2017. As such, I have now completed nearly 39 months of my federal sentence, although I have been incarcerated for about three years longer than that. I have remained discipline free during both my state and federal incarceration periods and have been awarded 314 days of statutory good time on my federal sentence. Assuming continued "clear conduct" my projected release date is currently January 1, 2022. I am eligible to be placed in a halfway house for a period of one year as early as January 01, 2021, and may be placed in home detention as of July 1st of 2021.

2. Post-Conviction Rehabilitation - Mental Health Treatment (for Trauma)

Upon sentencing, Chief Judge Smith recommended that I be placed in a facility capable of providing appropriate mental health counseling and treatment. However, I was originally designated to FCI Fort Dix, New Jersey, which is not a mental health facility (although it does offer the RDAP drug program). In any case, upon arrival at FCI Fort Dix in January of 2017, I began receiving very limited sessions with a psychologist (appx. 45 minutes every three months) to address my diagnoseses of PTSD, Anxiety, Depression and Dissociative Identity Disorder.

After approximately nine months, I was identified by my psychologists as being an appropriate and eligible candidate to participate in the Bureau of Prisons' RESOLVE program, which provides comprehensive trauma therapy. I applied for the program, was accepted, and in May of 2018 I was transferred to FCI Danbury, Connecticut to join RESOLVE.

The RESOLVE program consists of a Trauma Workshop, followed by three separate modules which are entitled "Seeking Strength", "Dialectical Behavior Group" and "Cognitive Processing Therapy Group" and entailed weekly group meetings and "weekly commitments" of written homework emphasizing the core skills identified by the program as beneficial to dealing with and growing from past experiences of trauma. While I am reluctant to restate my trauma history here, I respectfully direct the Court to my confidential pre-sentence investigation report which provides ample details of my nearly thirty year (at that time) history and battle therewith. I will, of course, provide any additional information which the Court my require.

I attended RESOLVE once a week (for 1.5 hours) from approximately October of 2018 until I graduated only a few weeks ago, on March 12, 2020. I was awarded certificates of completion for all three segments, plus the Workshop.

This achievement represents a significant milestone for me. For many many years I was reluctant to attend, and completely avoided group counseling, and I rejected any opportunity to discuss my trauma. Through RESOLVE I learned many skills which help me to cope with what happened a long long time ago, by focusing on the life I want to live now, as opposed to the one that was forced upon rne for most of my life. I was also provided the opportunity to meet one-on-one (multiple times) with the Program Director, who offered unconditional support and understanding and guided me through tremendously difficult and emotionally tumultuous times.

In addition to addressing my past trauma, the RESOLVE program helped me to work through tremendous amounts of guilt I have harbored for many years on many topics. Although I fully understand that I will still need much support when I am released, I strongly feel (for the first time in my life) that I have the confidence to seek that help before spiraling out of control and reverting to self-destructive behavior(s). And, more importantly, I am confident that I have developed the formidable and good judgment it takes to know from whom to seek that help.

Finally, following my graduation from RESOLVE, I was invited by the Program Director to participate in a monthly support group for graduates. The goal of these meetings is to reinforce skills learned in the program, and to continue to advocate their positive, timely and constructive use. It is noteworthy, that in order to participate in these meetings, I had to decline to be redesignated to a prison camp, and remained at FCI Danbury on what is commonly referred to as a "program variable". Put differently, due to my strong desire to maintain a counseling and therapy program, I declined the chance to move to a facility with far less security and restrictions and thus more privileges - a designation which is typically coveted by most inmates.

3. Educational Programs

In addition to completing all of the requirements to graduate from RESOLVE, I also participated in a number of Adult Continuing Education courses. I have received certificates of completion for Marketing, Intro to Real Estate and Understanding Government. Each of these certificate courses ran for 8 weeks and met between 1.5 and 3 hours a week. Similarly, until the COVID-19 shutdown, I was also actively involved in a course called "Money Smart", and the Bureau of Prisons's National Parenting Program. No information has been posted as to when those courses will resume. Finally, I am also now an assistant instructor in the Intro to Real Estate course.

B. CURRENT AND PAST MEDICAL HISTORY.

1. Current Medical History

As noted in my PSR, I am being treated for high blood pressure, thyroid disease, gerd, and high cholesterol. My thyroid condition has worsened and my medication regiment continues to change in order to treat a lack of the thyroid hormone. Similarly, my blood pressure has been wildly and continually out of control and my medication regiment continues to change in order to reduce my blood pressure readings - which currently consist of systolic readings ranging from 140s-190s, and diastolic readings ranging from the 90's-100s.

According to my primary care physician, my uncontrolled thyroid and blood pressure are interconnected with and frustrated by Type II Diabetes, which I was diagnosed with after sentencing. I am currently on insulin twice a day (Lantis (long acting) and Regular (short acting)). However, my diabetes is also uncontrolled, and I now have had blood glucose readings in the low to high 300s - where the normal therapeutic range is 80-100.

I have been as high as 400-600 and have been hospitalized four times since January of 2018, three of which were in the last 18 months. Additionally, in August of 2020, I was treated for a rare "strep"- based condition known as Erysipelas. At the same time, I had a severe case of bronchitis, which I still have not completely recovered from.

In March of 2000, my mother - who was also an insulin dependent diabetic - died from complications following a kidney transplant, necessitated by her diabetes.

### C. COVID-19 IN THE BUREAU OF PRISONS AND LIVING CONDITIONS AT FCI DANBURY.

1. BOP- Nationally

According to a memorandum released by Attorney General Barr, as of Friday, April 4th, 2020, the Bureau of Prisons had 91 confirmed cases of inmates infected with COVID-19, as well as 50 staff members. Unfortunately, there are also seven recorded inmate deaths. The same news article referring to General Barr's memo also stated "it is believed that those numbers understated the real figure and that hundreds more inmates and staff are infected."

2. BOP- FCI Danbury

As of the writing of this request, there are at least twenty-four confirmed inmate COVID-19 infections at FCI Danbury. Similar to the national statistics, this number, too, is likely understated. For that reason, General Barr HAS issued a directive to the Bureau of Prisons to expedite the process of identifying and transferring inmates from FCI Danbury (and two other facilities) who meet certain requirements, to home confinement. As near as can be determined, the criteria includes non-violent offenders who are over 60, who have certain medical conditions which increase an inmate's risk in either contracting COVID-19, or suffering exacerbated effects if the virus is

contracted. However, BOP officials have not published any specific criteria or method of selection from this program. Indeed, case managers approached today were "stumped" when provided with the information directly from inmates. In any case, I am only 49 years old (and will turn 50 in September of this year), thus I am unlikely for that relief based upon my age.

3. Danbury Living Conditions.

Before delving into the current living conditions at FCI Danbury, I respectfully ask the Court to consider the spirit and scope with which the following comments are made. I have no intention or desire to malign or call into question the level of dedication and commitment being displayed by a vast majority of the Danbury Staff during this crisis. I understand that they are overworked, understaffed, and that they themselves are each dealing with the stress of this global, national and local crisis. To make matters worse, like the rest of the Nation, they are following an unwritten and ever changing playbook.

As such, theses comments are made solely for the purpose of demonstrating for the Court the increased level of risk and danger that I am currently in while housed at this facility.

Having said that, FCI Danbury is situated within in the limits of Fairfield County, and is currently housing over seven hundred inmates. Fairfield County is currently Connecticut's epicenter, having the state's largest number of confirmed COVID-19 infections. As of April 04, 2020, that translated to 2825 of the state's 5126 cases - with 86 of the state's 165 deaths.

I currently live in a dormitory with 69 other inmates. My living space consists of a bunk bed shared with another inmate, and only 46 inches away from the next set of bunks. Even more problematic, the head of my bed is only 18 inches away from the bunk immediately behind me, where two other inmates live. Consequently, I sleep with my head exposed within LESS than six feet of six other inmates.

Similarly, the dormitory set up does not include any large common areas. There are two small rooms used for television viewing and one even smaller room for using the facility's Corrlinks email computers. These rooms are crowded and do not foster safe social distancing. Simply put, there is no place to go.

Shockingly, there are a number of inmates who continue to exercise extremely poor personal hygiene by refusing to shower, wash their hands after bathroom use, or to launder their clothing (although there has only been one opportunity to send clothes to the facility laundry since the institutional shut down). Although staff are aware of this situation, there does not seem to be anything being done about it. This obviously, and most certainly, complicates matters by creating an unsanitary living area.

We are currently allowed to eat one meal a day (lunch) in the facility dining room. During this meal the inmates are filed into the dinning room one housing unit at a time, allowed five minutes (literally) to eat, and then escorted back to the cramped housing

unit. I (and many other inmates) often do not attend the lunch meal because the experience is too rushed and only results in becoming more stressed over this situation. The other two meals (breakfast and dinner) are being delivered to the housing units in paper bags and are consumed in the living areas.

One hour of outdoor recreation per unit is offered daily. The facility's education department, recreation department, and law library are closed. I have no access to the Lexis Nexis system, typewriters or photocopying capabilities. As such, I am typing this request into a Corrlinks email and sending it to a third party who will manipulate it into a conventional letter and file it by mail with the Court. My research, such that it is, is limited to culling information from various prisoner newsletters and news services which arrive through Corrlinks email. This includes information from agencies like FAMM (Families Against Mandatory Minimums) and Fedcure who are tracking the filings and rulings within the United States District Courts across the country as they relate to COVID-19 filings.

Medical sick call is offered daily but represents an overworked and under staffed endeavor. Despite my blood sugar levels being highly elevated for more than three weeks, I have not been able to see a doctor and my insulin dose and regiment have not been adjusted. Similarly, I have not been able to attend the weekly blood pressure clinic or to consult with my doctor regarding the adjustment of my thyroid medication - if necessary.

Perhaps the most frustrating aspect of this whole experience is that many inmates are not reporting their sickness to staff because if they are determined to have Covid-19 symptoms they are immediately removed from the population and placed in isolation for at least fourteen days. During this time period they are confined for 24 hours a day to a single cell with no access to telephone calls or corrlinks email contact with their loved ones and friends. Accordingly, the fear of being further isolated from their family is prompting inmates to conceal symptoms in order to remain in the general housing areas. At night time, a Devil's Symphony ensues in the living areas with coughing and sneezing setting a steady and ominous cadence from lights-out (10:00pm) until 6:00 in the morning. To further place this into perspective, I respectfully remind the Court that I have to sleep within far less than six feet of at least six other inmates.

To reiterate, I am not alleging that staff are ignoring these and other concerns. Rather, I am illustrating that there simply are not enough staff members to handle matters, as many have either contracted the Covid-19 virus, or have called out sick. As of today, we were told that more than forty staff members out. By way of observation, there appears to be a single staff member supervising two separate housing units, each containing at least 70 inmates. When the officer is making rounds or attending to issues in one unit, there is no staff member in the other.

D. THE COURT'S AUTHORITY TO GRANT RELEASE FOR EXTRAORDINARY AND COMPELLING REASONS.

1. Administrative Remedy Process.

I anticipate that the Government may raise the issue that I have not exhausted my administrative remedies prior to bringing this request. While, technically that is correct, I respectfully submit that at this stage the administrative remedy process is both unavailable and futile. First, there is simply no way to obtain the appropriate forms to begin the process. I have not had access to my counselor or case manager for more than two weeks. Typically, I would see both of these staff members multiple times a day, and would have the ability to walk into their offices (which are located in two different units from where I live) during open house hours. That simply is not possible during the institution's shelter in place protocol. Moreover, the completion and submission of the necessary forms requires the attachment of multiple copies of each document, and as mentioned above, I have no access to photocopying capabilities.

Secondly, even if I did have access to the staff members and appropriate forms to initiate the remedy process, I respectfully ask the Court to consider the futility of such process under these circumstance. I am making this request in order to avoid contracting a fast spreading and highly contagious virus which (1) the CDC and medical community state that I am at a higher risk of contracting, and (2) which could very likely kill me if I do contract it. As this court is likely aware, it can take from many months, to over a year, to obtain complete review through BOP's standard administrative remedy process (BP8, BP9, BP10 and BP11). Each of these levels allows at least a 20-30 day response time, with several levels permitting multiple extensions of time. The time table afforded by the BOP's administrative remedy process is completely incompatible with the rapid transmission of COVID-19 in the best of environments. Let alone an environment such as the one the I am currently confined. To steadfastly require me to attempt to obtain relief through the administrative remedy process would be manifestly unjust and serve to increase the opportunity for me to contract the deadly sickness which I am desperately trying to avoid.

Finally, as noted above, General Barr's public announcements and directives themselves serve to illuminate the dire situation which currently exists within the BOP. More importantly, General Barr has specifically identified FCI Danbury as a facility which is in need of rapid transformation in order to limit the spread of COVID-19 among the inmate population.

Accordingly, I respectfully submit that the possibility of obtaining the relief sought herein through the administrative remedy process is non-existent. And, if such possibility did exist, it would be futile to attempt to obtain that relief when juxtaposing the arduous and time consuming task of navigating the administrative remedy process, against the fast moving, and deadly spread of the COVID-19 virus within the BOP.

2. COVID-19 RELATED DECISIONS ISSUED BY U.S. DISTRICT COURTS AROUND THE COUNTRY

Between April 1st and April 3, 2020, a number of District Courts have taken up Section 3582 motions under the extraordinary and compelling circumstances subsection, based upon the COVID-19 pandemic. I will illustrate some of them here.

UNITED STATES V. COLVIN, No. 3:19cr179(JBA), 2020 WL 1613943 (D.Conn, April 2, 2020). "She has diabetes, a serious... medical condition, which substantially increases her risk of sever illness if she contracts COVID-19. Defendant is unable to provide self-care with the environment of FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did developed complications, she would be unable to access her team of doctors at Bridgeport Hospital. In light of the expectations that the COVID-19 pandemic will continue to spread over the next several weeks, the Court concludes that that risks faced by Defendant will be minimized by her immediate release home, where she will quarantine herself."

UNITED STATES V. BRENNAN, No. 4:15CR08-01 (SDT2, April 02, 2020). Though not reflected in the order, emergency motion was granted on the same day of filing for prisoner who had served only 9 months of a 36 month sentence for fraud at FCI Oakdale and had not exhausted BOP remedies.

UNITED STATES V. FOSTER, No. 1:14cr324-02(MD PA. April 03, 2020). "The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment extraordinary and compelling, and we all believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he might not be expected to recover...No rationale is more compelling or extraordinary."

In highlighting these cases, I acknowledge that neither these decisions nor their rationale are binding upon this Court. However, I respectfully submit that in the absence of clear precedent from the First (or any other) Circuit - given the spontaneous eruption of the immediate problem - these cases illustrate adherence not only to the compassionate scope and nature of Section 3582, but to the express Congressional intent of Section 3582. Especially with respect to the "extraordinary and compelling" components thereof.

E. RELEASE PLAN

If the Court orders my immediate release from custody, I will adhere to the following plan, in addition to any other restrictions ordered by the court.

1. I will live with my sister in Cranston, Rhode Island.

2. I will immediately self-quarintine for at least fourteen days - or for whatever period the CDC is recommending at the time.

3. I will immediately obtain health care insurance by applying for coverage on Rhode Island's health care exchange.

4. I will immediately seek appropriate medical services, including obtaining a primary care physician.

5. I will immediately apply for acceptance into the District of Rhode Island's "Hope Court", to which I was introduced
    by members of the Court Staff while at FCI Fort Dix. I believe that this program will offer me the type of additional
    support that will assist me in maintaining a crime free life and finally being able to realize my full potential.

6. I will comply with all conditions of my current supervised release orders, including attending mental health counseling,
    and continuing the beneficial progress I have achieved through the RESOLVE Program.

7. I will immediately secure full time employment, as approved by my probation officer.

F. SUMMARY AND CONCLUSION

For all of the reasons set forth above, I respectfully request that this Honorable Court reduce my current prisons sentence and order my immediate release from custody, so that I may reduce my risk of serious illness or death, by being able to
provide appropriate self-care, to practice the social distancing and other recommendations made by the CDC, and to access
vital medical treatment, the cost of which will not be born by the Federal Government and its taxpayers.

Additionally, in the event that this court requires copies of medical records or reports, I respectfully request the appointment of counsel to assist me in submitting and expediting requests to the BOP or the community hospitals in which I have been treated. As pointed out above, I have absolutely no way of requesting or obtaining those records in a timely fashion in the best of times (typically medical records requests are processed in about 90 days) let alone now. Similarly, it will like take an inordinate amount of time for the Court to notify me of any such need, or to communicate with me concerning this request. The appointment of counsel will greatly facilitate and expedite any expansion of the record the Court may deem necessary, as well as my ability to communicate with the court.

Finally, I would request that the Court schedule an emergency video hearing or conference to address any evidentiary issues which may require resolution.

Respectfully Submitted:
/S/
Michael P. Tatro, Pro-se
Federal Correctional Institution
33 1/2 Pembroke Road
Danbury, CT 06811

CC: file
    Office of the United States Attorney
    Dr. Judith Shiendler, Federal Bureau of Prisons

Michael P. Tatro - Mr. Se
33 1/2 Pembroke Rd
Danbury, CT 06811

Chief Judge John J McConnell Jr
U.S. District Court
For the District Court of RI
One Exchange Street
Providence RI 02903

U.S. DISTRICT COURT
DISTRICT OF R.I.
APR [illegible] 2020